Estate of John B. Haskins, Deceased, H. Keith Harber, Executor v. Commissioner. Estate of John B. Haskins, Deceased, H. Keith Harber, Executor, and Rebecca B. Haskins, Surviving Wife v. Commissioner.
Estate of Haskins v. Commissioner
Docket Nos. 53505, 53506.
United States Tax Court
T.C. Memo 1956-145; 1956 Tax Ct. Memo LEXIS 148; 15 T.C.M. (CCH) 731; T.C.M. (RIA) 56145; June 20, 1956
*148 Held: 1. A part of the deficiency for each of the years 1941 to 1947, inclusive, was due to fraud with intent to evade taxes. 2. Respondent failed to sustain the burden of proof that some part of the deficiency for the year 1948 was due to fraud with intent to evade taxes. 3. Decedent's income tax returns for the years 1941 to 1945, inclusive, were false and fraudulent with intent to evade taxes, and the assessment and collection of deficiencies was not barred by limitations as to any of the years in which limitations are an issue. Charles L. Claunch, Esq., John C. Goins, Esq., and Landon H. Gammon, Esq., for petitioners. Lester R. Uretz, Esq., for respondent. FISHER
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax and additions to tax under section 293(b) against petitioners as follows: Estate of John B. Haskins, Deceased,
H. Keith Harber, Executor
Additions to
tax under
Year
Deficiency
sec. 293(b)
1941
$ 6,343.10
$ 3,171.55
1942
10,571.13
5,285.56
1943
17,238.07
8,619.04
1944
26,280.06
13,140.03
1945
33,057.81
16,528.91
1946
17,391.03
8,695.52
1947
10,555.66
5,277.83
Estate of John B. Haskins, Deceased,
H. Keith Harber, Executor, and
Rebecca B. Haskins
1948
$ 2,894.20
$ 1,447.10
1949
1,357.84
None
*149 Petitioners concede the correctness of the deficiencies in income tax as determined by respondent except that they raise the statute of limitations as a bar to the assessment or collection of the deficiencies determined for the years 1941 to 1945, inclusive. Petitioners likewise contest the application of additions to tax under section 293 (b) for all of the years for which they were determined. Findings of Fact The decedent, John B. Haskins, resided in Chattanooga, Tennessee. He filed his individual income tax returns for the calendar years 1941 to 1947, inclusive, with the collector of internal revenue for the district of Tennessee. The decedent and the petitioner, Rebecca B. Haskins, were husband and wife. They filed their joint income tax returns for the calendar years 1948 and 1949 with the collector of internal revenue for the district of Tennessee. During the taxable years in question and for many years prior thereto, decedent was a physician and surgeon practicing his profession in Chattanooga, Tennessee. Decedent died on May 5, 1953. H. Keith Harber is the duly qualified executor of his estate. With respect to the years 1941, 1942 and 1943, the decedent's books *150 and records could not be found. Bank deposit records were available, however, and decedent's income for those years was determined therefrom by the bank deposit method. Substantially all of decedent's income for those years was deposited in the disclosed bank accounts. For the years 1944 to 1949, inclusive, income was determinable from the information and records made available to the investigating agents. The nature of the unreported income for the taxable years 1941 to 1943, inclusive, was as follows: 1941
1942
1943
Additional professional income
$21,404.78
$23,610.28
$26,054.98
Capital gains
83.08
88.96
6,809.77
Ordinary income
136.82
Mathematical error on return
10.00
Annuity income
60.00
Additional depreciation allowed
(1,547.33)
(1,483.02)
(1,588.25)
Net unreported income
$20,077.35
$22,226.22
$31,336.50
Net income reported
3,149.02
7,446.87
10,915.86
Corrected net income
$23,226.37
$29,673.09
$42,252.36
In his income tax returns for the taxable years 1941, 1942 and 1943, decedent reported gross professional receipts in the amounts of $10,340.37, $18,840.27 and $18,739.67, respectively. During the taxable years *151 1941, 1942 and 1943, decedent sold five parcels of real estate, but did not report any of the gains from such sales. The details of the sales are as follows: Taxable Gain
Ordinary
Sales Price
Basis
Gain
Long-Term
Income
1941
Chamberlain & Glass Street
Realty
$ 3,220.00
$ 3,000.00
$ 220.00
$ 146.67
Building
4,830.00
4,297.26
532.74
$532.74
Georgia Ave.
Realty
654.61
750.00
( 95.39)
(63.59)
Building
5,242.76
5,638.68
(395.92)
(395.92)
Net unreported income
$ 261.43
$ 83.08
$136.82
1942
Alta Vista Drive
$ 6,762.62
$ 6,584.69
$ 177.93
$ 88.96
1943
606 Orr Street
$ 4,247.45
$ 2,375.48
$ 1,871.97
$ 935.99
Market Street
38,768.05
27,020.50
11,747.55
5,873.78
Net unreported income
$13,619.52
$6,809.77
Decedent claimed a deduction of $3,405 in 1941 as a loss on the sale of certain stocks and as a loss due to the worthlessness of other stocks. In 1942, he claimed a deduction of $300 as a loss from the sale of stock. The decedent's books and records made available to respondent's agent for the years 1944 to 1949, inclusive, consisted of cash receipts ledgers, expense *152 books showing office expenses, duplicates of receipts of payments issued to patients and patients' accounts receivable cards. Unreported income for the taxable years 1944 to 1948, inclusive, was as follows: 1944
1945
1946
1947
1948
Additional professional income
$37,473.64
$47,355.06
$31,259.84
$18,631.60
$ 3,577.33
Capital gains
6,027.92
606.09
Annuity income
272.50
1,282.50
1,620.00
2,018.12
2,602.50
Mathematical error
1,000.00
Depreciation adjustment
(1,124.44)
(872.75)
(179.65)
(364.65)
1,621.79
Adjustments to rental expenses
(2,661.54)
Additional contributions
(2,804.35)
(1,001.98)
Capital loss carry-over
(1,000.00)
Net unreported income
$42,649.62
$48,370.90
$29,895.84
$17,621.55
$ 6,801.62
Net income reported
$11,734.79
$14,172.21
$15,065.80
$22,623.46
$30,668.40
Corrected net income
$54,384.41
$62,543.11
$44,961.64
$40,245.01
$37,470.02
Decedent's professional income for the taxable years 1944 to 1948, inclusive, was understated as follows: 1944
1945
1946
1947
1948
Excess of the totals in the cash receipts
ledger over gross professional receipts
reported in returns
$18,663.99
$27,744.00
$ 6,596.87
$ 5,380.30
$ 3,000.00
Credits on patients' payment cards not
recorded in the cash receipts ledger
19,459.79
15,703.64
9,949.03
7,287.68
Payments as indicated by duplicate copies
of receipts which were not recorded in
either the cash receipts ledger or on the
patients' payment cards
366.97
11,867.40
5,252.22
Unreported industry payments
916.50
Accounts placed for collection but col-
lected in taxpayer's office and unre-
corded in the cash receipts ledger
2,017.55
1,256.00
312.50
Commission deducted from collections by
collecting agency
1,355.21
1,209.75
1,512.47
1,300.28
612.33
Mathematical errors in cash receipts
ledger
(4,022.90)
158.20
1,021.57
777.62
Unclaimed expenses
(1,366.50)
(35.00)
Net unreported gross professional income
$37,473.64
$47,355.06
$31,259.84
$18,631.60
$ 3,577.33
*153 A comparison of the gross professional receipts as reported by decedent in his income tax returns for the years 1944 through 1948 and as shown by his cash receipts ledgers reveals the following discrepancies. Per Books
Per Returns
Discrepancy
1944
$37,953.66
$19,289.67
$18,663.99
1945
48,234.27
20,390.27
27,744.00
1946
35,405.87
28,809.00
6,596.87
1947
39,997.85
34,617.55
5,380.30
1948
45,134.04
42,134.04
3,000.00
Comparison of the payments recorded on patients' accounts receivable cards with the cash receipts reported in the cash receipts ledgers disclosed that over 5,000 credits on patients' accounts receivable cards were omitted from the cash receipts ledgers during the years 1944 through 1947. The omissions are shown by the following summary of the credits on accounts receivable cards which were not posted to the cash receipts ledgers: 1944
1945
1946
1947
January
$ 1,972.40
$ 1,131.15
$ 344.66
$ 512.60
February
2,240.50
1,256.00
250.00
507.00
March
1,832.44
1,080.74
862.01
1,429.00
April
2,097.27
1,086.00
794.19
1,218.00
May
3,273.36
1,219.00
1,188.27
1,280.00
June
2,259.00
733.00
739.93
946.56
July
2,541.17
1,354.00
640.15
439.95
August
880.42
1,458.23
544.26
97.00
September
1,108.00
1,429.50
991.00
510.00
October
582.10
1,438.00
1,331.56
142.00
November
159.13
1,631.00
1,679.00
169.00
December
514.00
1,887.02
584.00
36.57
$19,459.79
$15,703.64
$9,949.03
$7,287.68
*154 In addition to the credits on accounts receivable cards which were omitted from the cash receipts ledgers, many payments, as evidenced by duplicate copies of cash receipts issued to patients, had not been recorded on either the patients' accounts receivable cards or on the cash receipts ledgers. Duplicate receipts were available from the latter part of 1945 through 1949. The omissions are shown by the following summary of duplicate receipts which were not posted to the cash receipts ledgers: 1945
1946
1947
January
$ 475.60
$ 107.00
February
351.00
390.00
March
527.90
1,236.00
April
$ 1,096.51
$ 744.70
May
767.40
344.91
June
1,100.10
1,027.84
July
747.00
1,100.50
August
$ 17.00
1,833.50
301.27
September
1,604.75
October
154.00
1,624.64
November
195.97
1,274.50
December
464.50
$366.97
$11,867.40
$5,252.22
A portion of decedent's practice during the war years consisted of the giving of medical examinations to employees of war industries. The following five payments for services rendered to such industries were omitted from the cash receipts ledger in 1945: Feb. 2 Combustion Engineering Co.
$246.00
June 5 Combustion Engineering Co.
622.50
June 6 Dickey Clay & Mfg. Co.
4.00
Sept. 11 Dickey Clay & Mfg. Co.
20.00
Oct. 10 Dickey Clay & Mfg. Co.
24.00
$916.50
*155 The following is a comparison of the reported and unreported professional receipts for the years 1941 to 1948, inclusive: Professional Receipts
Year
Reported
Unreported
1941
$10,340.37
$21,404.78
1942
18,840.27
23,610.28
1943
18,739.67
26,054.98
1944
19,289.67
37,473.64
1945
20,390.27
47,355.06
1946
28,809.00
31,259.84
1947
34,618.55
18,631.60
1948
42,134.04
3,577.33
Decedent had unreported gains from the sale of real estate during the taxable years 1944, 1945, 1946 and 1948 as follows: Taxable Gain
Sales Price
Basis
Gain
Long-Term
1944
Kirby Ave.
$ 4,150.00
$ 1,148.77
$ 3,001.23
$1,500.61
Commodore Apt.
14,880.61
106 Cameron Hill
45,946.72
21,750.00
9,316.11
4,658.06
Georgia Farm
10,869.25
11,000.00
(130.75)
(130.75)
$12,186.59
$6,027.92
1945
Georgia Ave.
$ 2,765.11
$ 2,260.11
$ 505.00
$ 252.50
2704 E. 46th St.
1,875.00
1,017.82
857.18
428.59
Two lots
500.00
650.00
(150.00)
(75.00)
$ 1,212.18
$ 606.09
1946
11th & King Sts.
$33,725.74
$29,479.30
$ 4,246.44
$2,123.22
1611-13 Read Ave.
5,087.89
3,675.00
1,412.89
706.44
$ 5,659.33
$2,829.66
1948
Market & 23rd Sts.
$ 4,661.02
$ 2,000.63
$ 2,660.39
$1,330.20
*156 In 1946, decedent took deduction of $1,000 based on a long-term loss of $10,000 due to the fact that certain stock he owned became worthless in that year. All of decedent's real estate transactions during the taxable years in issue were handled either by John Crabtree or by E. Cecil Phillips, both of whom were real estate agents in Chattanooga, Tennessee. Decedent's real estate agents furnished decedent a detailed statement of each purchase and sale of real estate at the time of the occurrence thereof. Decedent's practice increased greatly during the years 1941 through 1945 because of the entry into the Armed Forces of many of the younger doctors in Chattanooga. He saw and treated an average of 70 to 100 patients a day, six days a week, and an undisclosed number on the seventh day during the years involved herein. In addition, he performed surgical operations. The decedent at the time of his death was charging two and three dollars for office calls and four dollars for house calls. He charged the minimum fees listed by the Hamilton County Medical Society in its fee schedules for all operations which he performed. Largely as a result of the war, personnel turnover in decedent's *157 office was high. During most of the years in issue, decedent had a succession of bookkeepers, many of whom would stay for only a short period and then quit. The omissions of professional income from decedent's cash receipts ledger were due to incompetent employees, careless bookkeeping, and the failure of Haskins to exercise any supervision or control over the bookkeeping, either individually or through competent auditors. A certified public accountant prepared decedent's income tax returns for all of the years involved herein. Decedent's income tax returns were made out by the accountant from statements of income and expenses prepared by employees in decedent's office, with respect to professional income, and from information furnished by employees of two real estate agents with respect to rents. The latter furnished no information with respect to profits from real estate transactions. The accountant never examined decedent's books and records. Each year, shortly before decedent's income tax returns were due, employees in his office would prepare work sheets from his books and records. During the years 1944 to 1948, inclusive, these statements consisted of a list of decedent's *158 professional expenses, dividends, director's fees and personal deductions, but did not include his professional income or rental income. After the work sheets described above were prepared, they were handed to decedent who in turn would deliver them personally to the accountant or give them to someone in his office for delivery to him. Subsequent to the receipt of decedent's work sheets for each of the years 1944 through 1948, the accountant would telephone decedent's office to obtain decedent's professional income. Someone in decedent's office would give the accountant a figure supposedly representing decedent's professional income which the accountant would insert on decedent's work sheets and later transcribe to decedent's income tax returns. Elizabeth Garrett Rigsby worked for the decedent from the latter part of 1933 or the first part of 1934 until May 1946. She did X-ray work, helped in the treatment room and the emergency room, took down the medical histories of patients and got them ready for the decedent. She also did some bookkeeping when no one else was available. During the period Mrs. Rigsby worked for decedent, the work sheets which were prepared for the accountant's *159 use were given to the decedent who would deliver them personally to the accountant. Katherine Lee Bennett had been employed as decedent's bookkeeper from the autumn of 1943 until the summer of 1947. She helped prepare the work sheets which were furnished the accountant. Miss Bennett usually gave the accountant over the telephone what she stated to be decedent's professional receipts totals. Idell Eberhart O'Neil was employed by decedent as secretary and bookkeeper from July 28, 1947, until August of 1950. She assisted in the preparation of the work sheets furnished the accountant in 1947 and 1948 and totaled the cash receipts ledgers for those years. A good deal of the time the employees handling the books were as much as six and seven months behind in their bookkeeping entries. They kept this from decedent because they feared his reactions. Not only did they fail to do anything about it, but one of the employees, in answer to telephone inquiries from the accountant, gave him gross receipts figures which she knew to be nothing but a guess. The accountant would obtain decedent's rental income by telephoning the offices of John F. Crabtree and E. Cecil Phillips, decedent's real *160 estate agents. The accountant had been instructed by decedent to procure from the real estate agents whatever information was required for income tax purposes. Decedent had also authorized the real estate agents to furnish such information to the accountant. The accountant procured no information with respect to sales of properties, and no such information was furnished to him by the real estate agents. Some time after the accountant was furnished decedent's work sheets during each of the years in question, decedent would go to the accountant's office, sign his income tax return, and give the accountant a check, usually in blank, which he had signed but had not filled out. The accountant would then fill in the check with the amount of the tax owed as shown by the return and mail the check and the return to the collector of internal revenue for the district of Tennessee. The determination of deficiencies by respondent for the years 1941 to 1945, inclusive, occurred more than five years after the returns for those years were filed. The investigation of petitioners' returns was begun in June 1950, while Haskins was still living, at which time he furnished to the revenue agents all *161 of his records except his office records for 1941, 1942 and 1943, which latter records could not be found. He also gave the agents information concerning his bank accounts and instructed his employees and the certified public accountant who had prepared his returns and those who handled his real estate transactions to assist and give the agents all available information relative to his income. Haskins was well regarded in his community as a man of integrity and high moral character. He had a very large practice, to which he devoted his constant efforts. He gave no personal attention to the keeping of income records, either in connection with professional income or in connection with rents or capital gains from the sale of real estate. Haskins personally made no entries on his books or records. His office personnel kept the records of his professional income and deductions for each year, and furnished to the accountant figures purporting to show his income and expenses. He instructed the accountant and the real estate agents to cooperate in assembling information concerning rents and the sale of real estate. His income tax returns were prepared by his accountant. His failure *162 to report income from annuities was due to misinformation received by him from an insurance agent. The income tax returns for all of the years in question are signed by John B. Haskins. The returns for 1948 and 1949 are also signed by his wife. Each of the returns for the years 1943 to 1949, inclusive, contains a printed certification, immediately above the signature of the taxpayer, reading as follows: "I declare under the penalties of perjury that this return (including any accompanying schedules and statements) has been examined by me and to the best of my knowledge and belief is a true, correct, and complete return." The certification on the return for 1942 is largely to the same effect, but contains some additional language not here significant. On the return for 1941, the certificate is in the form of an affidavit, but is otherwise substantially the same as that contained on the 1942 return. The affidavit on the 1941 return was subscribed and sworn to by Haskins before John T. Menefee, the accountant who prepared the return. All of the other returns in question are signed by Menefee as the person who prepared the return. The 1941 return form does not require such signature. *163 A part of the deficiency in each of the years 1941 to 1947, inclusive, was due to fraud with intent to evade taxes. The income tax returns of decedent for each of the years 1941 to 1945, inclusive, were false and fraudulent with intent to evade taxes. Opinion FISHER, Judge: Subject to the defense of limitations applicable to the years 1941 to 1945, inclusive, petitioners concede that respondent has correctly determined deficiencies in income taxes for the years 1941 to 1949, inclusive. Petitioners deny any fraud, and contest the determination of fraud penalties. Penalties were determined for all years involved except 1949. Both the limitations issue and the applicability of penalties depend upon our determination of whether or not, in any of the years in question, there was fraud with intent to evade taxes. Respondent faces the burden of proving fraud by clear and convincing evidence. Frank Imburgia, 22 T.C. 1002; Arlette Coat Co., 14 T.C. 751. We first consider the fraud issue for the years 1941 to 1947, inclusive. At the outset, we eliminate from our discussion the minor factor of failure to report income from annuities. We are satisfied, upon *164 the evidence, that such failure was due to mistaken advice received from an insurance agent. The revenue agent called to testify by respondent stated that he had not attributed fraud to the failure to report such annuity income, and respondent did not charge fraud for the year 1949 in which such income was likewise omitted. We hold, therefore, that such omission was not fraudulent. The most significant factor relating to fraud is decedent's failure to report substantial income from the practice of his profession. For one of the seven years (1945), his unreported professional income was over $47,000 and was more than double the amount actually reported from that source in the year in question. His unreported professional income for each of the years 1944 and 1946 exceeded $30,000. In 1944, the amount unreported was almost double the amount reported. In 1946, the amount unreported exceeded the amount reported. In the years 1941, 1942 and 1943, the professional income unreported was in excess of $20,000 for each year. The amount unreported for 1941 was double the amount reported, and the amount unreported for 1942 was in excess of the amount reported for that year. For 1947, the unreported *165 amount of $18,631.60 was more than half the amount reported. Decedent was practicing as an individual and, of course, was aware of the extent of his practice and the fees he was charging. That there were gross understatements of professional income must have been apparent to him upon his examination and execution of the returns during the seven consecutive years of substantial understatements. Decedent had taxable long-term gains from the sale of real estate for the consecutive years 1941 to 1946, inclusive, in the respective amounts of $83.08, $88.96, $6,809.77, $6,027.92, $606.09, and $2,829.66, none of which he reported. He also failed to report $136.82 of ordinary income for the year 1941, likewise attributable to real estate transactions. The details of the transactions were reported to him by the real estate agents at the time the transactions occurred. While the facts as to these gains were not turned over to the accountant by the real estate agents' employees, (for what reason and because of whose laxness we do not know) the omission to report them was apparent on the face of the several returns. We may contrast this with the fact that deductions were taken in the years *166 1941, 1942 and 1946 for long-term losses resulting from the sale or worthlessness of securities. (It should be noted that because of the limitation on the amount of the deduction for long-term capital losses in 1946, and the size of the loss, the failure to report long-term gain from the sale of real estate for 1946 did not affect decedent's tax for that year. This did not, however, relieve the decedent from the duty of reporting the long-term gain, which would affect the amount of the loss carry-over which might be used in subsequent years.) Petitioner's answer to all of the foregoing is that decedent never examined the returns and was, therefore, unaware of the understatements of professional income and failure to report gains from the sale of real estate. We think that the certification to each of the returns, subscribed by decedent himself, to the effect that he had examined the return and accompanying schedules and statements, and that to the best of his knowledge and belief the return was true, correct and complete, belies such a possibility. We think it incredible that decedent could have been so heedless of his duties as a taxpayer that for seven consecutive years he paid *167 no attention whatsoever to a document as significant as a tax return. That the decedent was aware of the significance of an income tax return is evident from the various instructions given by him to his accountant and his real estate agents. It is also indicated by the careful attention given to the taking of deductions. Moreover, he was concerned enough about the tax consequences of annuities to give attention to the advice of his insurance agent. If he was otherwise so oblivious in his duties as a taxpayer (which we do not believe), his failure in this duty and his disregard of the requirements of the law have placed him and his estate in a position for which he alone is responsible. The accountant who prepared the returns testified that decedent had signed all of them without reading them. We cannot accept this testimony as fact. We were favorably impressed with the accountant, and we have not concluded that his testimony was intentionally incorrect. We do not believe, however, that, in 1955, he could have recalled accurately that in the rush period of preparation and execution of returns, some one of his clients, for seven straight years (1941 to 1947, inclusive) or for any particular *168 one of them, did not examine his return before subscribing it. It is particularly significant in this connection that the 1941 return discloses that the accountant himself took decedent's affidavit. We assume that in doing so he acted as a notary or in a similar official capacity, although such capacity is not designated on the return. The accountant was undoubtedly familiar with the language of the certification with respect to examination of the return, schedules and statements, so that if we are to accept his testimony as true, we must, as a corollary, accept the view that he knowingly collaborated with decedent in the execution by the latter of a false affidavit. We do not think the accountant would have done so, and we conclude, therefore, that the certification was correct insofar as it related to examination of the return by decedent. It is our view, therefore, that the accountant's recollection was faulty when he testified that decedent had not examined the 1941 return. If his recollection was faulty as to the return for one year, we see no reason to credit his testimony as to the other years. There is much in the record to the effect that various persons, including employees *169 of decedent, were negligent and incompetent in the keeping and assembling of records, and that the correct data was never turned over to the accountant. We see no need to discuss these factors. The significant factors in the case are that the income on each of the returns was grossly understated, that the decedent subscribed the certificates which we have discussed to the effect that he examined the returns, that the only reasonable inference is that he did examine them, and that it must have been apparent to him that there were gross understatements in each and omissions as to most. We think the views expressed in Cooper v. United States (C.A. 8, 1925) 9 Fed. (2d) 216, are here significant. The Court said (p. 222): "But it is claimed that knowledge on the part of the defendants of the contents of the returns is not shown; that they may have been made up by employees, without personal knowledge on the part of the Coopers. It was shown that defendants were the sole owners of the corporate stock. The corporation was a family affair. They were in sole and entire charge of the business; upon them was enjoined the duty of making these returns under oath. The owner of a *170 business need not be the actual bookkeeper, to be familiar with the affairs and finances of that business. It would present a somewhat startling situation if a taxpayer, charged by law with this duty, could sign and file a false return, made to defraud the government, and escape punishment by disclaiming knowledge of that which he has sponsored. Of course, he would not be liable for innocent clerical mistakes; but he must be held to know that which it is his duty to know, and which he solemnly promulgates. We do not by this recognize imputed or presumed knowledge or intent. We merely hold that the situation presented is one from which the jury was entitled to infer knowledge on the part of the defendants." See also M. Rea Gano, 19 B.T.A. 518, 533 (1930). Petitioner relies heavily upon Wisley v. Commissioner (C.A. 6, 1950) 185 Fed. (2d) 263, in urging a contrary conclusion. There are some similarities in the facts, but there are also material differences. We think the significant distinction is that, in Wisely, supra, the Court emphasized that Wisely admitted he knew his returns were only estimated; that he realized he was in tax difficulty; that as soon *171 as possible after finding out through an employee that his income had been greatly understated, he secured help from friends, who placed their personal auditors on his books; and that he filed amended returns correcting the situation. No such circumstances are found in the instant case, although it should be added that decedent did cooperate after the investigation began. See discussion of Wisely v. Commissioner, supra, in Owens v. United States, 98 Fed. Supp. 621, 628, (1951), affd. (C.A. 8, 1952) 197 Fed. (2d) 450. We think the foregoing is sufficient to demonstrate that Wisely, supra, cannot be taken as here controlling. We hold on the basis of the foregoing discussion that part of the deficiency for each of the years 1941 to 1947, inclusive, was due to fraud with intent to evade taxes, and that each of the returns for the years 1941 to 1945, inclusive, was false and fraudulent with intent to evade taxes. As a result, we sustain respondent in applying additions to tax for fraud under section 293(b) for the years 1941 to 1947, inclusive. We likewise hold that the statute of limitations is not a bar to assessment and collection for the years 1941 to 1945, *172 inclusive, with respect to which the defense of limitations was raised. We do not think respondent has established fraud by clear and convincing evidence for the year 1948. For that year, petitioner included in his return professional income in the amount of $42,134.04 and omitted such income to the extent of only $3,577.33. The entire pattern seems to us to be changed, and we cannot say that an examination of the 1948 return by decedent would have disclosed a discrepancy of such a small amount. It is true that petitioner also failed to report taxable long-term capital gain from the sale of real estate in the amount of $1,330.20, but it appears from the statutory notice of deficiency that petitioner was entitled to a capital loss carry-over from 1947 in excess of said long-term capital gain, so that, although the gain should have been reported, the omission did not result in an additional deficiency for 1948. We hold, therefore, that additions to tax under section 293(b) are not to be applied for the year 1948. Decisions will be entered under Rule 50.